**REDACTED**

```
            IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF NORTH CAROLINA
                   GREENSBORO DIVISION
                FILE NO. 1:15-cv-159-TDS-JLW
```

_____

JEFFREY H. RANDLEMAN,

      Plaintiff,

vs.

ALAMANCE COUNTY SHERIFF TERRY S.
JOHNSON, in his individual and
official capacities, and JOHN DOE
CORPORATION, in its capacity as
Surety on the Official Bond
of the Sheriff of Alamance County,

      Defendants.

_____


_____

DEPOSITION

OF

SHERIFF TERRY S. JOHNSON
VOL. I
_____


OFFICE OF THE ALAMANCE COUNTY ATTORNEY
124 W. ELM STREET
GRAHAM, NORTH CAROLINA


Tuesday, October 25, 2016
9:57 A.M.
PAGES 1 THROUGH 190

1                    ATTORNEYS OF RECORD PRESENT

2

3       On behalf of Plaintiff:

4           NARENDRA K. GHOSH, ESQ.
            PAUL E. SMITH, ESQ.
5           Patterson Harkavy, LLP
            100 Europa Drive, Suite 420
6           Chapel Hill, NC 27517
            nghosh@pathlaw.com
7           psmith@pathlaw.com

8
        On behalf of Defendants:
9
            WILLIAM L. HILL, ESQ.
10          Frazier Hill & Fury
            P.O. Drawer 1559
11          Greensboro, NC 27402-1559
            whill@frazierlawnc.com
12

13      On behalf of Alamance County:

14          CLYDE B. ALBRIGHT, ESQ.
            Alamance County Legal Department
15          124 West Elm Street
            Graham, NC 27253-2865
16          clyde.albright@alamance-nc.com

17

18

19

20

21

22

23

24

25

1                     I N D E X

2        Reporter's Note: This transcript may contain
     quoted material.  If so, such material is reproduced
3    as read or spoken.

4

5                    INDEX OF EXAMINATIONS

6                                                      PAGE

7        By Mr. Ghosh  . . . . . . . . . . . . .        4

8

9                     INDEX OF EXHIBITS

10    NUMBER              DESCRIPTION              PAGE

11     1     Policy, Disciplinary Procedure/Rules of    38
             Conduct
12
       2     Policy, Internal Affairs/Citizen Complaints  43
13
       3     Policy, Internal Affairs/Citizen Complaints  44
14
       4     Policy, Grievance Procedures               47
15
       5     Defendants' Answers to Plaintiff's First   70
16           Set of Interrogatories, Request for
             Production of Documents and Requests for
17           Admission

18     6     Policy, Harassment in the Workplace        97

19     7     Memo to All Personnel from Sheriff Terry   100
             S. Johnson, REF:  Voluntary Employee
20           Relationships, 11/21/11

21     8     Summary of Jeffrey Randleman's Employment  108

22     9     Employee Evaluation Form, 2/7/07 to 12/8/07 114

23     10    Memo to Director Richard Longamore from     122
             Sgt. Dan Cubino, 6/30/16
24
       11    Citizen Complaint Form, 3/19/14             127
25           ██████████

1          E X H I B I T S  (Continued)

2      12    Report to Robert Wilburn (sic) from          128
             A.D. Carter, 3/21/14
3
       13    Memo to Tim Britt from Captain Wilborn        129
4            Ref: ███████████ Complaint, 3/27/14

5      14    Justice News, September 18, 2012              135

6      15    Complaint                                     138

7      16    Citizen Complaint Form to Captain            150
             Wilburn (sic) From Randy Denham, 10/29/13
8
       17    Memo to Jeff Randleman from Tim Britt        152
9            10/29/13

10     18    Memo to Richard Longamore from Dr. Kling     152
             11/5/13
11
       19    Memo to Richard Longamore from Dr. Kling     155
12           12/12/13

13     20    Notice of Findings of Internal               158
             Investigation
14
       21    Terminated Employee Form                     169
15
       22    AVL Report                                   176
16
       23    Report of Separation                         180
17

18

19

20

21

22

23

24

25

1     A.   I think it was the -- I want to say December

2    the 2nd, 2002.

3     Q.   And you have been the sheriff since then?

4     A.   Yes, sir.

5     Q.   What are your -- what do you do on a

6    day-to-day basis as the sheriff?

7     A.   You name it, I do it.  No.  You certainly --

8    I review a lot of our reports from, you know, the

9    night before.  I talk with my captains and my major

10   to make sure that what is supposed to be done is

11   being done in the county.  I talk with commissioners

12   to try to obtain our -- you know, what we can as far

13   as equipment and training.  I talk with my county

14   attorney on issues that there may be questionable

15   issues about.  There's been times that I've honestly

16   answered calls because calls were backing up.  I

17   meet with my detective division on every major case,

18   then get briefed on basically a daily basis.  I'm a

19   liaison with the judges and DA's office for my

20   office.  And I mean I could go on and on all day

21   long.

22    Q.   And do you have -- I mean part of your job

23   is personnel matters and having --

24    A.   I leave most of the personnel issues --

25   certainly I make the final decision, but if there's

1     an internal investigation, it's done by the

2     personnel division or a captain, and then they bring

3     that -- you know, the findings to me.  From there,

4     I'll make the decision.

5         Q.   What about hiring?

6         A.   I interview every prospective employee that

7     comes in.  When I say interview them, I want to meet

8     every person that I appoint.  I don't hire them.  A

9     sheriff appoints people to work at their pleasure.

10            And we have a personnel division that does

11    the background, you know, all the criminal history,

12    history checks, lines up the psychologicals, lines

13    up the physical fitness assessment, and does the

14    physical fitness assessment.  And once all the

15    hiring process is completed by personnel, I'll

16    review that process and make the appointment.

17        Q.   And do you also review, you know, promotions

18    or other, you know, movements within the department

19    of officers?

20        A.   Yes, sir.  We currently -- it's put out.

21    People that are qualified, there's certain thing --

22    and for certain positions, you have to have been

23    like a sergeant for so many months and not have any

24    write-ups.  And we will get together.  As the staff,

25    we will discuss all of the applicants.  And then

1    Carolina to courts from courts, to state facilities.

2          We have a court division that handles

3    security in the courtrooms, that handles courthouse

4    security, going through the metal detectors, et

5    cetera.  Shucks, I'm trying to think.

6        Q.  That's very helpful.  You mentioned there's

7    280 --

8        A.  I think it's 280 positions right now.

9        Q.  Is that sworn officers or everybody?

10       A.  No.  That's everybody.  That's support

11   personnel.  I think we have 141 in detention.  We

12   have now I think 100- -- I think it's 137 that are

13   sworn that's --

14       Q.  All together?

15       A.  Yeah.  And then we have -- that includes our

16   school.  We have eight school resources officers,

17   too.  Yes, it's a headache.

18       Q.  At the very -- at the very top, I mean who

19   are the -- and you mentioned that a lot of these

20   sections are headed by captains and I guess you

21   mentioned detention was headed by a major.  And then

22   who was at the very -- sort of like who's like right

23   under you?

24       A.  Okay.  Of course I'm the sheriff.  I have a

25   chief deputy.  Under the chief deputy, I have a

1      Q.   And who did you run against in that

2  election?

3      A.   That was Ron Parrish.

4      Q.   Ron Parrish.  And had he been in the

5  department?

6      A.   He had been in the department, yes, sir.

7      Q.   What had he --

8      A.   He was a major in the department in my first

9  two terms.

10     Q.   Over what section?

11     A.   He was in the detention at that time.

12     Q.   And Mr. Compton, you said he had been in the

13  department.  What position had he --

14     A.   Mr. who?  Compton?

15     Q.   Compton that you ran against in 2006.

16     A.   Yes, sir.  I think he -- like I said, he was

17  a patrol -- captain, I think, in patrol.  And that's

18  my recollection because you're going way back.

19     Q.   Mr. Parrish -- after the election in 2010,

20  did Mr. Parrish stay with the department?

21     A.   No, sir, he did not.

22     Q.   And then the next election was 2014?

23     A.   That's correct.

24     Q.   And who did you run against in that

25  election?

1       A.   Nobody.

2       Q.   I'd like to talk about the procedures for

3   imposing discipline on a sworn officer --

4       A.   Okay.

5       Q.   -- in the department.

6            What is the general procedure for

7   disciplining an officer?

8                MR. HILL:  Now or then?  I mean is

9   there a time frame?

10               MR. GHOSH:  Now or I guess, you know,

11  in recent -- recent years.

12      A.   Okay.  If an individual files a complaint,

13  we take every complaint that's filed.  An

14  investigation will be done by our Internal Affairs.

15  Then that is reviewed by my chief deputy, whatever

16  the findings are.  And then that is brought up the

17  ladder.  I get the last look at it.

18           And every -- now they make a recommendation

19  of punishment.  I have the opportunity to follow

20  that recommendation or lessen the punishment or

21  harsher the punishment.  And at that time, you know,

22  administer whatever punishment there is.

23      Q.   And you said when a complaint comes in.  So

24  that's more like when a complaint comes in from like

25  a citizen or someone outside?

1    had -- we had just completed it within the last

2    month, month and a half, something like that.  And

3    we were in -- what do you call it, negotiations with

4    DOJ.  And they said, well, we'd like these words to

5    be put here, et cetera.  We changed those policies.

6    And as a matter of fact, I got my manual I think two

7    weeks ago, but have not had an opportunity to sit

8    down and read it.

9         Q.   I'm going to show you what we'll mark as

10    Exhibit 2.

11         (PLAINTIFF'S EXHIBIT NUMBER 2 WAS MARKED.)

12         Q.   Could you look at this --

13         A.   Oh, sorry.  I was looking at the wrong one.

14             Okay.  There's been some changes, I know, to

15    this particular policy as far as wording in some of

16    the issues.

17         Q.   And is this the Internal Affairs/Citizens

18    Complaint --

19         A.   Yes, sir.

20         Q.   -- policy for the department?

21         A.   Yes, sir.

22         Q.   And this was effective April of 2005?

23         A.   Yes, sir.

24         Q.   And as you mentioned, there may have been

25    some changes to it just recently?

1    A.    That's correct.

2    Q.    And does this policy generally set forth how

3    internal investigations are supposed to be

4    conducted?

5    A.    And complaints can be filed by citizens and

6    different avenues, et cetera.

7    Q.    If you look on page -- and I -- I apologize.

8    This is what was produced in discovery.  I think it

9    was actually missing a couple of pages.  Let me give

10   you another copy of this.

11   A.    Okay.

12   Q.    Let me give you what we'll mark as

13   Exhibit 3.

14   (PLAINTIFF'S EXHIBIT NUMBER 3 WAS MARKED.)

15   Q.    If you look at -- Exhibit 2 is missing a

16   couple of pages.  So I think this is a complete copy

17   of the same policy

18   A.    Okay.  Can I look at these?  Oh, yeah.  It's

19   missing a couple of pages.  When I looked at it, I

20   said, "Wait a minute.  This ain't..."

21   Q.    I think I had the same experience.  And I

22   think it was just an oversight of the production.

23   But this -- is this a more complete copy of the same

24   policy?

25   A.    It shows all the pages in there.

```
1        Q.   Looking at page 4, subsection C there
2   discusses employees' rights --
3        A.   Right.
4        Q.   -- in the process?
5        A.   Yes, sir.
6        Q.   And that includes the right to be notified
7   that they're subject of an internal investigation?
8        A.   That's correct.
9        Q.   And they -- and they are, you know, entitled
10  to some basic information before they are
11  interviewed, I guess?
12       A.   That's correct.
13       Q.   And they are -- if you turn to the next
14  page, like they're entitled to know the findings of
15  the investigation; is that right?
16       A.   Where are you?
17       Q.   In the --
18       A.   Certainly we notify them of the findings, if
19  we substantiated --
20       Q.   Yeah.  The second -- the second bullet
21  point.
22       A.   Right.  Whether substantiated,
23  unsubstantiated or can't be resolved.
24       Q.   And then if you turn to page 6 of the
25  policy --
```

1      A.   Okay.

2      Q.   -- and subsection E.

3      A.   Yes, sir.

4      Q.   That lists like the different categories of

5   how an investigation is resolved; is that correct?

6      A.   That's correct.  There's a sheet now that

7   you check unfounded, unresolved, exonerated or

8   sustained.

9      Q.   And so unfounded means that whatever is

10  alleged to have happen didn't --

11     A.   Didn't.

12     Q.   -- didn't actually happen?

13     A.   That's correct, sir.

14     Q.   Unresolved means it's just unclear?

15     A.   One against another and there's no other

16  information that -- it could go either way.

17     Q.   Exonerated means that something -- what

18  happened -- what alleged to have happened, happened,

19  but that the officer has not -- hasn't done anything

20  wrong; is that right?

21     A.   Right.

22     Q.   And then sustained means it happened and

23  it's --

24     A.   That's correct.

25     Q.   -- and it's a violation, it's -- they did --

1     A.    Yes, sir.

2     Q.    -- something wrong?

3     A.    Yes, sir.

4     Q.    And then I guess a little bit further down

5     the page there, section 5, subsection 8 talks about

6     the different types of discipline that can be

7     imposed on an employee?

8     A.    Right.

9     Q.    And that ranges from all the way from just

10    counseling all the way to dismissal?

11    A.    Yes, sir, that's correct.

12    Q.    And I'm going to show you what we'll mark as

13    Exhibit 4.

14        (PLAINTIFF'S EXHIBIT NUMBER 4 WAS MARKED.)

15    Q.    And is this the grievance procedure policy

16    for the department?

17    A.    It looks like it, yes, sir.

18    Q.    Okay.  And this was effective April of 2005?

19    A.    That's correct.

20    Q.    And it was in place until perhaps recently,

21    maybe -- do you know if this was changed recently?

22    A.    I'm sitting here trying to think.  I know a

23    couple of those others were, but I don't believe

24    this was changed.

25    Q.    And is this sort of grievance process the --

1    what's used for officers who want to appeal a

2    discipline decision?

3        A.   Yes, sir.

4        Q.   Is it important to have these discipline and

5    investigation -- internal investigation policies all

6    be written?

7        A.   Well, certainly if your employees don't have

8    a -- the guidelines, you know, there could be some

9    problems.  And that's the reason after our deal with

10   DOJ, we went back at their request.  They reviewed

11   our policies.  And whatever recommendations they

12   made, we tried to implement.

13       Q.   So it's -- one reason why it's important to

14   have this all written is so that officers know very

15   clearly what's expected of them and what

16   consequences could be --

17       A.   Yes, sir.

18       Q.   -- if there's a problem?

19       A.   Yes, sir.

20       Q.   That's just -- are there any other reasons

21   why it's important to have these policies all

22   spelled out?

23       A.   Well, certainly I think, you know, if you're

24   going to expect an employee's conduct to be where,

25   in my opinion it should be, as a law enforcement

```
 1     officer, you need policies and procedures for them
 2     to follow.
 3         Q.   When -- when a sheriff is elected --
 4         A.   Yes, sir.
 5         Q.   -- the sworn officers in the department need
 6     to be resworn in; is that right?
 7         A.   That's correct.
 8         Q.   Okay.
 9         A.   They're resworn, reappointed to the position
10     of deputy sheriff.
11         Q.   Why is that requirement?
12         A.   Why?  Because, you know, they serve at the
13     pleasure of the sheriff and they serve the people.
14     And every law enforcement officer should take an
15     oath of office and should fulfill that oath by all
16     means.  And I even swear my detention officers in.
17         Q.   When you have a sheriff of a department and
18     then that sheriff is re-elected, do the officers
19     still go through the screening process?
20         A.   They go back and reappointment and
21     reswearing, yes, sir, every single one of them.
22         Q.   And is -- why do you have that reswearing
23     even if the sheriff is not changing?
24         A.   Because -- well, the sheriff is changing
25     because it's a new appointment term for that
```

1 we've had with that individual; do I want that

2 individual representing me as an appointed deputy;

3 do I want him representing the citizens of the

4 county as an appointed deputy.  And if they do not

5 fulfill what I feel like should be, I don't swear

6 them back in.

7   Q.  So what factors do you take into account

8 when deciding whether or not to reswear somebody in?

9   A.  Certainly numerous factors that I look at.

10 One is integrity.  One is following policy and

11 procedures.  One is dedication.  Don't want no lazy

12 officers; don't want no incompetent officers.  And I

13 could go on with a ton on the list of what I look at

14 and what I want representing me and what I want

15 representing this county wearing a badge.

16   Q.  Are there other significant factors that you

17 haven't mention?

18   A.  Certainly.  Like I say, integrity,

19 truthfulness, willingness to accept responsibility

20 for your actions.  I mean I could go on and on.

21   Q.  What materials do you review in making that

22 decision?

23   A.  Sometimes, and not all the time, sometimes

24 personnel files; internal investigations; previous

25 complaints; community support, talking to the people

1        in the community that the individual serves; talking

2        with staff.  A ton of things.

3            Q.   So when you have -- you know, when you are

4        elected or re-elected, do you -- do all of -- do you

5        review materials between whenever you're elected or

6        re-elected to the time of swearing in?  Like when

7        does that review occur?

8            A.   Well, once again, as I said before, part of

9        my job as sheriff, I review all kinds of things

10       during the day on a daily basis.

11               And if I -- if I have an officer that, you

12       know, there's a light coming on, they've got to be a

13       problem here, certainly I keep up with -- with that

14       officer in talking with his lieutenant, captain,

15       whatever.

16           Q.   At the -- at the time -- so I understand

17       that you are reviewing things on an ongoing basis.

18           A.   Have to.

19           Q.   But at the -- at the time, at the sort of

20       very time that you're making the reswearing

21       decision, at that point do you review materials for

22       every officer?

23           A.   I won't say every officer, no, sir.

24           Q.   About how many officers do you end up taking

25       a closer look at?

1      A.    It depends on the officer.  I mean, you

2      know, it depends on the officer, how many officers,

3      you know.

4      Q.    Okay.  Who -- in making the decision to --

5      whether or not to reswear an officer, who do you

6      talk to about that?

7      A.    Well, certainly my chief deputy and I

8      discuss issues on a daily basis.  We have a staff

9      meeting every Monday morning.  If we hear of any

10     possible problems or work-related issues with

11     officers, I ask my captain or lieutenants, if

12     they're having a problem with a young officer or an

13     officer, to develop a work plan for him to make that

14     corrected.  If he don't, then, you know, he could be

15     punished if he is constantly violating policy.  That

16     decision is made on an individual basis.

17     Q.    When you're deciding to reswear people in --

18     and you've got to make decisions on about 280

19     people; is that right?

20     A.    Uh-huh.

21     Q.    Do you have like a list of everyone?  Do you

22     go through like a list?  Or I mean how do you --

23     A.    I do have a list.  And I certainly review a

24     list.  I am constantly on the radio listening to

25     officers.  I am constantly -- I have a walkie talkie

1      Q.   In doing that, you talked about having --

2   you have daily meetings with your chief deputy or

3   weekly meetings with your -- with your staff, do

4   you -- when you're going down that list, do you do

5   that with the chief deputy or with anyone else?

6      A.   I sure, you know, I've -- I've talked on --

7   before I allow someone -- not swear them back in or

8   terminate them, I talk with my chief deputy and I

9   talk with the captains and I talk with the direct

10  supervisors.

11     Q.   So when you're considering not reswearing

12  someone, then you have further conversations about

13  that person?

14     A.   Most of the time, yes, sir.

15     Q.   And you said that would be with your chief

16  deputy and then --

17     A.   Yes.

18     Q.   -- the lower level supervisors for that --

19     A.   Yes.

20     Q.   -- particular officer?

21     A.   Most of the time, yes, sir.

22          Now, once again, if it's an individual that

23  I've had previous problems with down the road and it

24  comes to a swearing in issue and they don't fit the

25  mold of Alamance County deputy sheriff that I think

1   they need to fit, I don't swear them in.

2       Q.   When --

3       A.   I don't appoint them.

4       Q.   When going through -- in making -- going

5   down this list and deciding who to reswear, do you

6   ever talk to the officers themselves?

7       A.   Sometimes.

8       Q.   When would that be?

9       A.   That would be before the swearing in

10  ceremony.

11      Q.   But would you -- would you talk to the

12  officers -- if you had a question about whether or

13  not to reswear somebody in, would you talk to the

14  officer before making that decision?

15      A.   Sometimes, sometimes not.  If the violation

16  or the conduct had been over a period of time,

17  absolutely not, I would not.

18      Q.   And if there wasn't much past conduct, then

19  you -- then you would talk to the officer?

20      A.   Depending on what the conduct was.

21      Q.   In going down the list, if you have a

22  question about whether to reswear someone in

23  particular, do you look at their personnel file?

24      A.   Would I look at their personnel file?

25      Q.   Yes, sir.

1     Q.   And sorry, just are these your responses to

2     Plaintiff's interrogatories --

3     A.   Yeah.

4     Q.   -- in this?

5          Have you seen this document before?

6     A.   Have I seen this document?

7     Q.   Yes.  Just look at the front and maybe it

8     will --

9     A.   Yes, I think I have.

10    Q.   Okay.  And these are Defendants' responses

11    to --

12    A.   Right.

13    Q.   -- the Plaintiff's discovery requests?

14    A.   Right.

15    Q.   Okay.  And if you're looking at page 12

16    there, does that -- do you remember now which

17    officers you chose not to reswear in in 2006?

18    A.   I think ███████████ was one of them, ██████

19    ████.  I can't remember.

20    Q.   Why was ███████████ not resworn in?

21    A.   Wasn't doing his job.  He wasn't doing his

22    job.  He was selling insurance or something on the

23    side.  Stayed on his county phone so long.  And he

24    was talked to and continued to do it.  And I didn't

25    swear him back in.

1    Q.   So was that like a one-time incident or was

2    that sort of multiple incidents?

3    A.   He -- no, it wasn't a one-time incident, no,

4    sir.  He was staying on his phone.  And I remember

5    we asked for him to bring his investigation files

6    in.  We wanted to review what he had done on them

7    and he couldn't find 60 some of them.  And I didn't

8    swear him back in.

9    Q.   Was he disciplined at any point for not

10   doing his job or...?

11   A.   No.  When his sergeant and lieutenant would

12   meet with him, he was saying, you know, I've got all

13   my cases up to date, blah, blah, blah.  He didn't

14   have them up to date.  And he couldn't find I think

15   it was 61 or 62 of the case files.  We had a copy of

16   the case files, if you understand what I'm saying.

17   Q.   Uh-huh.  So did you -- did you meet with him

18   about those case files as part of --

19   A.   He was -- he was talked with several times.

20   Q.   Okay.  So he was talked with several times

21   before the decision was made not to reswear him in?

22   A.   That's correct.

23   Q.   Okay.  And during those times when he was

24   spoken to, was he disciplined at any point?

25   A.   I'd have to go back and pull -- I think he

1     was.  I may be wrong, but I'd have to go back and

2     pull his internal investigation files, if any exist,

3     and his personnel file.

4          Q.   If he was -- and you mentioned, too, that he

5     was, I guess, doing work for his insurance job?

6          A.   It's some other job he -- and I want to say

7     selling insurance or something while working for the

8     county.

9          Q.   So while he was on the clock, he was --

10         A.   That's correct.

11         Q.   -- doing work for some other job?

12         A.   Exactly.  And we --

13         Q.   And I take it that's not permitted?

14         A.   No, sir.

15         Q.   If he was doing another job while on the

16    clock and not able to keep track of his case files,

17    why wasn't he terminated as part of the normal

18    discipline process?

19         A.   I think he was disciplined.  And when we

20    come up trying to check his files and he could not

21    find 60 of them, I chose not swear him back in.

22         Q.   And that --

23         A.   Removed him.

24         Q.   Okay.  So at that time when he couldn't come

25    up with the 60 files, was that around the time of

1          Q.   And then you had to choose to reswear all

2     officers or not?

3          A.   Right.

4          Q.   Okay.  Were there any officers that you

5     chose to not reswear in 2010?

6          A.   I'll be honest with you, I don't recall.  I

7     could go back and review the files and tell you.

8          Q.   Do you remember ███████████?

9          A.   Yes, sir.

10         Q.   Okay.  Was -- who was he?

11         A.   ███████ was a deputy back then and is a

12    deputy now.

13         Q.   Okay.  Was -- did you elect not to reswear

14    him in in 2010?

15         A.   I think I did and -- I did not swear him in

16    2010, but then went back and rehired him, because of

17    the domestic situation with his wife, and they got

18    it straightened out.

19         Q.   Why did you not reswear him in in 2010?

20         A.   I don't need major marital problems within

21    the organization with other agencies or people

22    involved with other agencies, married couples.  I

23    will not tolerate it.  It only causes problems.  And

24    at that time, as I recall, Mr. █████ and his wife

25    were having a problem over another girl, who is no

1    longer with the Sheriff's Office.  And they got

2    their marriage straightened out.  And as I recall,

3    he came back and is working with me right now doing

4    a good job.

5        Q.   So he at that -- at that time, he was having

6    a problem with his wife with regard to another

7    woman?

8        A.   Uh-huh.

9        Q.   And does his wife work for the department?

10       A.   No.

11       Q.   No.  Okay.  But this other woman worked for

12   the department?

13       A.   Did.

14       Q.   Did work for the department at that time?

15       A.   Uh-huh.

16       Q.   Okay.  And so he --

17       A.   She don't work here anymore.

18       Q.   And he was having his -- was his marital

19   difficulties affecting his job performance?

20       A.   Oh, yeah.

21       Q.   How was it affecting his performance?

22       A.   Well, 2 o'clock in the morning, I get a call

23   to come to the office.  The wife raising cane; he

24   was raising cane.  You'd have to be a sheriff some

25   day to understand it.

1    And at the time, I told them both, "You all

2    better -- ████████, you're going to be gone.  You

3    better get your stuff straightened out or you won't

4    be in law enforcement long."  Because some of the

5    other agencies are not going to put up with that

6    type of stuff.

7    Q.   So it was his -- his wife had come to the

8    department at 2:00 in the morning --

9    A.   Oh, yeah.

10   Q.   -- to complain about him?

11   A.   He and his wife.

12   Q.   They had both come to the department?

13   A.   That's correct.

14   Q.   And was it because -- I guess my question is

15   like why did they come to the department?

16   A.   Another woman.  She -- another -- she

17   thought another woman and her husband and...

18   Q.   Okay.  So she -- because this other woman --

19   A.   But --

20   Q.   Because this other woman was working in the

21   department --

22   A.   That's correct.

23   Q.   -- she came to the department to confront

24   her or something like that?

25   A.   No.

1    Q.   Or to confront --

2    A.   To tell me to do something about the

3    problem.

4    Q.   I see.  I see.  So she came -- she wanted to

5    come to you to do something about it?

6    A.   To make me aware that there's a possible

7    problem there.  And, you know, I sat and listened to

8    them, counseled them and explained, you know, that

9    that was unacceptable to Mr. ████, if in fact it

10   was occurring.

11   Q.   Okay.  Besides that -- that one -- I guess

12   was it -- you said it was 2 o'clock in the morning?

13   A.   It was about 2 o'clock in the morning.

14   Q.   Besides that one time at 2 o'clock in the

15   morning, was there any other point at which

16   Mr. ████'s relationships were interfering with his

17   job performance?

18   A.   There were some questionable circumstances

19   that, I know as an officer, were probably occurring,

20   but it was nothing I could sink my teeth into, if

21   you know what I mean.  But based on his wife coming

22   down there, I felt that there was probably some

23   credence to what my thoughts were.

24   Q.   And as your counsel has indicated, we do

25   have a protective order, so normally confidential

1   materials can be discussed here.  So I'd ask, I mean

2   what were your concerns specifically?

3       A.   My concerns was, and it did happen but not

4   because of him, that another family would be broken

5   up.  I had to terminate two -- well, I actually

6   terminated one officer and the husband left on his

7   own because he couldn't stand the heat that went

8   with the situation.

9       Q.   Okay.  So it sounds like your -- your

10  concern with Mr. ████ was that he -- his

11  relationships were affecting other people?

12      A.   Absolutely.

13      Q.   Okay.  But other -- I guess my question is,

14  other than the time that his wife came to the

15  department, was it -- was there any effect on his

16  job performance or was he -- was his job performance

17  just fine?

18      A.   ████ is a great officer.  But when you're

19  not looking after your home life, a whole lot of

20  things is affected.  I wound up, like I said, having

21  to get rid of another female officer.  It broke up

22  her and her family.  Almost broke up Mr. ████'s.  I

23  think probably not swearing him back in registered

24  with him.

25           I could not definitely prove.  I know what

```
1     the husband of the female officer told me, what the

2     wife of this officer told me.  And I did not need

3     that problem at the Alamance County Sheriff's Office

4     and would not tolerate it.  And I did not swear him

5     back in.

6          Q.   So Mr. ███ was having a relationship with

7     someone else in the department, a woman in the

8     department.  Was that a staff member or another

9     officer?

10         A.   No.  It was an officer.

11         Q.   Another officer?

12         A.   Uh-huh.

13         Q.   Okay.  Was that someone that he was

14    supervising in any way or just a colleague?

15         A.   A colleague.

16         Q.   And I think you indicated that just having

17    that sort of situation can affect a person.  So were

18    you seeing effects on his performance from having

19    that situation?

20         A.   Yes, sir.  Not only affects the person, but

21    it affects the entire department.

22         Q.   Because it creates conflict within the

23    department?

24         A.   Like I say, if I'm mad at you because

25    you're -- my wife is an officer and I'm an officer
```

1     and you get out here and you get in a shootout, am I

2     going to come help you?  Heck no.  That's the way --

3     that's where a lot of this stuff affects a

4     department.

5        Q.   And the female officer that he was having a

6     relationship with, was her husband also on the

7     force?

8        A.   Yes, sir.

9        Q.   Okay.  So that's -- so there were like I'd

10    say three people in this -- these relationships that

11    were on the force that created complications?

12       A.   Yes, sir.

13       Q.   These issues with Mr. ████, were these --

14    was this happening for a long time or was this close

15    to 2010?

16       A.   I have no idea how long it had been going

17    on, but it was fairly close.

18       Q.   Okay.  So when it came to your attention it

19    was --

20       A.   Fairly close.

21       Q.   -- fairly close in 2010?

22       A.   Yes, sir.

23       Q.   And was --

24       A.   And like I said, I'm going by memory now, if

25    you understand.

1    Q.   Was Mr. -- at any point, did Mr. ▋ go

2    through the formal discipline process for any of the

3    problems he was having with his work because of

4    this?

5    A.   First of all, until the termination of the

6    female and her husband leaving on his own, I did not

7    have concrete -- because I can only go by what the

8    wife had said and a statement he let slip, but it

9    was not concrete enough for me to get rid of him at

10   that time.

11   Q.   Okay.  So before you let go of him, you had

12   some more sort of concrete -- you gained some more

13   concrete --

14   A.   Yes, sir.

15   Q.   -- information about the relationships he

16   was having?

17   A.   Yes, sir.

18   Q.   Okay.  And that's what prompted you to --

19   A.   That's correct.

20   Q.   -- let him go in 2010?

21   A.   That's correct.

22   Q.   And you said that that other female officer

23   and her husband also --

24   A.   They're gone.  Yes, sir.

25   Q.   Were they -- did they resign or were they

1      terminated?

2          A.    No.   I -- I terminated, I think.   I can --

3      hold on a minute.   Let me -- I -- can I review?

4          Q.    Yes, please.

5          A.    October 26 she was terminated.

6          Q.    I'm sorry, of what year?

7          A.    That was 2011 that she was terminated.   The

8      swearing in, he was -- ██████, I can't remember if

9      he left on his own at that time.   I'd have to go

10     pull the file.

11         Q.    Okay.

12         A.    But anyway, later on it was determined

13     she -- she left and her husband --

14                 MR. HILL:   What was her name?   If I

15     could -- just to get the name on the record.

16                 THE WITNESS:   ████████████.

17     BY MR. GHOSH:

18         Q.    ██████████.   Thank you.   And so she

19     was an officer --

20         A.    Now, I don't want these peoples' reputations

21     destroyed.   Is this --

22                 MR. HILL:   There is a protective

23     order --

24                 THE WITNESS:   Okay.

25                 MR. HILL:   -- mutually agreed upon --

 1                    THE WITNESS:  Okay.

 2                    MR. HILL:  -- to only use this

 3      information in this --

 4                    THE WITNESS:  Because we're talking

 5      about personnel issues here.

 6                    MR. GHOSH:  Yes.  And the protective

 7      order encompasses all --

 8                    THE WITNESS:  Okay.

 9                    MR. GHOSH:  -- personnel materials that

10      are being discussed --

11                    THE WITNESS:  Okay.  All right.

12                    MR. GHOSH:  -- in this case.

13                    MR. HILL:  And that's accurate, what he

14      just said.

15                    THE WITNESS:  Okay.

16      BY MR. GHOSH:

17          Q.   So Ms. ██████ was terminated in 2011?

18          A.   Right.

19          Q.   And that was through the formal discipline

20      process?

21          A.   What --

22          Q.   Yeah.

23          A.   Let me explain.  There was -- the wife and

24      then, you know, of Mr. █████ come in with Mr. █████

25      early in the morning.  We -- and I'll just tell you,

```
1     I tried to -- to get facts to terminate both of them

2     at that point in time.  Didn't have it.  There was a

3     big party of officers with a lot of drinking.  And

4     that's where the facts come out of what went on.

5         Q.   Okay.  So facts came out --

6         A.   People discussed --

7         Q.   -- about their relationship?

8         A.   Yes, sir.  That's correct.

9         Q.   And as a result, Ms. ████████ --

10        A.   That's correct.

11        Q.   -- was terminated in 2011?

12        A.   That's correct.

13        Q.   And that was pursuant to the policies that

14    we had discussed this morning, like the discipline

15    policies and the --

16        A.   Yes, sir.

17        Q.   When did you rehire Mr. ██████?

18        A.   I'd have to look at his sheet, but it was a

19    couple years later or three years later.

20        Q.   In 2014 you were re-elected?

21        A.   That's correct.

22        Q.   And you had to decide whether or not to

23    reswear in all of the officers and staff members?

24        A.   That's correct.

25        Q.   Which officers did you choose not to reswear
```

```
 1        Q.   Okay.

 2        A.   That's conduct unbecoming.

 3        Q.   You consider that conduct unbecoming?

 4        A.   Yes, sir, I do.

 5        Q.   Okay.  Is -- so what is the definition of an

 6   extramarital affair?

 7        A.   When you are married or you are separated

 8   and not legally divorced and you have sex with an

 9   individual or you are married and they are not.

10        Q.   Okay.  So if you were married and they are

11   not who you are married to, that's an extramarital

12   affair?

13        A.   Yes, sir.

14        Q.   And if you are not married and they are

15   married, that's an extramarital affair?

16        A.   Yes, sir.

17        Q.   Okay.  And if you are separated but not yet

18   divorced?

19        A.   That's still an extramarital affair.

20        Q.   Okay.  Is that explained anywhere?

21        A.   Don't need an explanation.  If I'm not

22   divorced from you, we're still married even though

23   we're separated.

24        Q.   If you are unmarried and you have a

25   relationship with someone else who is unmarried, is
```

1    office. And then he left me in 2003, went with

2    Elon, and then come back two years later

3    approximately.

4        Q.  So he was -- so he was an officer at the

5    Sheriff's Department when you were first elected?

6        A.  Yes, sir.

7        Q.  Okay. And according to this document, he

8    was a sergeant at that time?

9        A.  Yes, sir, according to that document.

10       Q.  He was a sergeant in 2002?

11       A.  Yes, sir.

12       Q.  Okay. And you -- you swore him in at that

13   point or reappointed him?

14       A.  Yes, sir, reappointed him.

15       Q.  Were you aware of any problems with his job

16   performance or him in any way, you know, in 2002?

17       A.  I had a little inkling something was wrong

18   with his marriage to his wife, ████, but I thought

19   they had got that straightened out when I swore him

20   in.

21           I believe in giving everybody a chance

22   coming in as a new sheriff because I've had the

23   opportunity to see when I was at the SBI new

24   sheriffs come in and fire everybody. And a lot of

25   good officers lost their job. And I was hoping, you

1    know -- and Randleman, as far as I knew, was a

2    decent officer at that time, but he had marital

3    problems.

4       Q.   Okay.  So apart from his marital problems,

5    did you have any knowledge of any problems with his

6    job performance or --

7       A.   No, sir.

8       Q.   -- work or anything?

9       A.   I wouldn't have kept him if I did.

10       Q.   Okay.  And then you mentioned he resigned to

11    go to the Elon Police Department in 2003?

12       A.   That's correct.

13       Q.   Okay.  Did -- when he did that, did you give

14    a reference or were you asked about him?

15       A.   I don't believe so, but I -- you know, at

16    that point in time, I would -- you know, I'd have

17    said he -- he was a good officer.  I'm talking about

18    in a lot of ways.  And then I don't know what

19    happened after a couple of years.  I don't know what

20    happened.

21       Q.   He came back to the department in 2005?

22       A.   That's correct.  I believe 12/8/05 is what I

23    have.

24       Q.   Okay.  And that's -- it says 12/1 on this

25    document, but that's about right.

1          Did you approve that decision?

2     A.   Yes, sir.

3     Q.   Okay.  Why?

4     A.   Why?  We were shorthanded.  We were looking

5     for people experienced.  And we couldn't send people

6     to BLET because you're looking at a six-month or

7     16-week stint or longer.  And he already had his

8     certification and I swore him back in.

9     Q.   And you thought he was a good officer?

10    A.   I had no problem at that time with

11    Mr. Randleman.

12    Q.   In 2006, this indicates he was promoted to a

13    deputy II?

14    A.   That's correct.

15    Q.   And what is the difference between a

16    deputy I and a deputy II?

17    A.   Okay.  A deputy I, you come in at a starting

18    salary.  After 18 months of good work, no write-ups

19    or anything by your supervisor, you're automatically

20    elevated to a deputy II, which is 4 and a half

21    percent raise.

22         After another 18 months of a similar

23    situation, you know, you're improving, no write-ups,

24    nothing bad, you go to a deputy III, which is 4 and

25    a half percent raise.  And then as positions open

1    didn't -- what I'm saying, it wasn't job

2    performance.  I think it was personal stuff in his

3    life and I wasn't privy to that.

4        Q.   Okay.  Did the stuff in his life though have

5    any detrimental effect on his job performance?

6        A.   Not at that point in time.

7        Q.   And why did you choose to reswear him in in

8    2006?

9        A.   Because he had been a good officer up to

10   that point.

11       Q.   I'm going to show you what we are marking as

12   Exhibit 9.

13       (PLAINTIFF'S EXHIBIT NUMBER 9 WAS MARKED.)

14       Q.   What is this document?

15       A.   This is a -- what we call -- it's the old

16   Alamance County Employee Performance form.  Since

17   then, they have redone the system.

18       Q.   Okay.  And this -- but this was the

19   evaluation form that used to be used in the

20   department?

21       A.   That's correct.

22       Q.   And this is one for Mr. Randleman?

23       A.   That's correct.

24       Q.   And it indicates on the first page that this

25   is for the period of 2007?

1          A.    Yes, sir.

2          Q.    Okay.  And then if you look on the I guess

3    third page, it's got Mr. Randleman's signature and

4    then it's got a supervisor's signature at the very

5    bottom of that third -- the third page.

6          A.    Third page.

7          Q.    This page.

8          A.    Okay.

9          Q.    Do you see Mr. Randleman's signature?

10         A.    Yes, sir, I do.

11         Q.    And then below that there's a supervisor's

12   signature?

13         A.    Sergeant Dan Cubino.

14         Q.    And that was Mr. Randleman's --

15         A.    That was his --

16         Q.    -- sergeant?

17         A.    -- sergeant in the Immigration and Customs

18   Enforcement Unit, ICE unit.

19         Q.    Was Mr. Cubino the head of the ICE unit?

20         A.    No, sir.  He was the sergeant.  At that time

21   Lieutenant Randy Denham was actually over the ICE

22   unit at that point in time.

23         Q.    But Officer Cubino was Mr. Randleman's

24   direct supervisor?

25         A.    That's correct.

1     Q.   And then on the last page, is that your

2  signature?

3     A.   That's my signature.

4     Q.   And that's -- you're the -- as the head of

5  the department?

6     A.   That's correct.

7     Q.   And when you sign off on performance

8  reviews, does that mean that you've reviewed the

9  evaluation?

10    A.   Yes, sir.

11    Q.   Okay.  And does that mean that you've agreed

12 with it?

13    A.   Yes, sir.

14    Q.   Okay.  And you look over it, it seems to say

15 that Officer Randleman was doing a very good job and

16 was exceeding expectations; is that right?

17    A.   Yes, sir.

18    Q.   Were evaluations done every year in the

19 department?

20    A.   Well, up until the County decided they were

21 changing the form, there was a period of time that

22 those evaluations weren't done.  And then when the

23 County developed the new forms and stuff, we -- and

24 of course we evaluate our people on a daily basis.

25 But the actual forms when the County come back, we

1    started, you know, re-evaluating people.

2        Q.   When were these forms discontinued?

3        A.   That's probably the last time they were

4    used.

5        Q.   Okay.  And when were the -- when were the

6    new forms adopted?

7        A.   I think we started doing the new forms -- I

8    can give you an approximate time.  Around '09 or

9    '10, somewhere like that, '11, something like that.

10   And I'd have to go back and double-check.  There

11   were several years there where they weren't.

12   Evaluations weren't done for the County.

13       Q.   Have you seen any evaluation forms for

14   Mr. Randleman that are more recent than this one?

15       A.   I would have to check, sir.  I haven't -- I

16   haven't -- I didn't go -- I went through the

17   Internal Affairs, you know, file stuff.

18       Q.   Okay.  But as you sit here right now, can

19   you recall seeing any more recent evaluations?

20       A.   I'm not saying yes and I'm not saying no,

21   but I haven't seen them.

22       Q.   Okay.  So Officer Randleman was in the ICE

23   unit and detention?

24       A.   Yes, sir.

25       Q.   And then at some point he was appointed to

1    with him.  Every time I'd see him, my people

2    assigned to the task force, I want to know what's

3    going on.

4        Q.   So then he went back to the ICE unit in

5    detention?

6        A.   Uh-huh.

7        Q.   And he -- he would have been at that point

8    still a corporal; is that right?

9        A.   Yes, sir.

10       Q.   And then in 2010 you were re-elected?

11       A.   Yes, sir.

12       Q.   And you had to decide whether to reswear in

13   your officers?

14       A.   Yes, sir.

15       Q.   Okay.  And you reswore in Officer Randleman?

16       A.   Yes, sir, I did.

17       Q.   Why did you do that?

18       A.   He give me no reason not to at that point in

19   time.

20       Q.   Were you aware of any problems in his job

21   performance up until 2010?

22       A.   No, sir.

23       Q.   In 2011, he was assigned back to the patrol

24   division?

25       A.   Yes, sir.

1    Q.   Okay.  What do you know about that?

2    A.   I'll go back and try to remember it.  That

3    he showed up.  That ███████████, ever how you say

4    her name, I think was seeing him at one time.  And

5    she -- they split up and she moved in with a

6    ███████ guy that used to be a deputy before I took

7    office in Alamance County and at that time was a

8    state trooper.

9         As I recall, he went over to her house or

10   his house at 4:30 in the morning raising cane.  And

11   as a result of that, we had to do an internal

12   investigation because a complaint was filed.

13        Mr. Randleman attended counseling after that

14   to handle some of his anger.  And that's basically

15   what I know.  It did cause us a little problem

16   between us and the highway patrol.  But that was

17   basically conduct unbecoming in my opinion.

18   Q.   So who -- who made the complaint about

19   Mr. Randleman?

20   A.   Ms. ███████ (sic).

21   Q.   ███████████

22   A.   ███████████

23   Q.   And who was her husband or former husband?

24   A.   Well, ███████.  I cannot think of his first

25   name right now.

1    Q.    ██████████?

2    A.    ████████    that's right.  That's

3    correct.

4    Q.    So she was with ████████████?

5    A.    She was living and had been living with ████

6    ████████    from the time they split.

7    Q.    Okay.  And the complaint was -- you said

8    that Mr. Randleman was being directed to do some

9    counseling?

10   A.    That's correct.

11   Q.    Was he disciplined?

12   A.    I think, you know, agreeing to attend

13   counseling and everything.  I made up my mind at

14   that point in time that I would not be appointing

15   him back as a deputy sheriff.

16   Q.    Did you know that ████████    was -- had

17   been married -- who she had been married to?

18   A.    No, sir.

19   Q.    Do you know ████  ████████?

20   A.    Yes.  Yes, I do.  Yes, sir.

21   Q.    Who is ██████████?

22   A.    Well, he used to be a deputy also with

23   Alamance County Sheriff's Department.  I know --

24   I'll go back.  He come -- well, he was not here as a

25   deputy when I took over, but that was -- she used to

1    be married to him.

2        Q.   So Ms. ███████ was married to ████

3    ████████?

4        A.   That's correct.

5        Q.   And he was a former officer with the

6    department but not while you were the sheriff?

7        A.   That's correct.

8        Q.   Did Mr. ████████ make a complaint about

9    Mr. Randleman's relationship with Ms. ██████████?

10       A.   I recall Chief Deputy Britt telling me that

11   he had come down complaining in early stages.

12       Q.   In the early stages of their relationship?

13       A.   Right.

14       Q.   Mr. Randleman and --

15       A.   Right.

16       Q.   -- Ms. ████████'s relationship?

17       A.   That's correct.

18       Q.   Okay.  And what did -- was it Chief Deputy

19   Britt?

20       A.   Chief Deputy Britt, yes, sir.

21       Q.   What did Chief Deputy Britt tell you about

22   his complaint?

23       A.   I think he talked to Mr. ███████.  And at

24   the time, you know, there was nothing we could do.

25   I mean she was divorced from Mr. ██████ and there

1   was not a whole lot we could do at that point in

2   time.  However, it did cause, I think, some problems

3   within the department because Mr. ███████ still had

4   a lot of friends here.

5       Q.   So Mr. ██████ spoke to Chief Deputy Britt?

6       A.   That's what I recall, yes, sir.

7       Q.   Okay.  Did anyone else meet with

8   Mr. ███████?

9       A.   Usually when we have a person that is

10  complaining, two people normally will meet with

11  them.  And I don't know.  You would have to ask

12  Mr. Britt that.

13      Q.   Did Mr. ██████ say that he was hiring a

14  private investigator?

15      A.   I don't know.  I don't ever recall talking

16  to Mr. ██████.

17      Q.   Did Mr. ██████ file a citizen complaint?

18      A.   I personally didn't see a citizen complaint.

19  Chief Deputy Britt would have handled that.

20      Q.   Did someone then in the department meet with

21  Mr. Randleman about Mr. ███████'s complaint?

22      A.   I'm sure they did.

23      Q.   Did you meet with Mr. Randleman about that?

24      A.   I did not.

25      Q.   Did Chief Deputy Britt meet with

1    Mr. Randleman about that?

2        A.   You'll have to ask him.

3        Q.   Do you know if he did or not?

4        A.   I feel sure he did.  I mean that would be

5    what I would do if I was in his position.

6        Q.   Do you know what Chief Deputy Britt or

7    anyone else told Mr. Randleman to do?

8        A.   I do not.

9        Q.   Do you know if anyone told him to end his

10   relationship with Ms. ███████?

11       A.   I do not.

12       Q.   Did anyone tell him that that relationship

13   was a problem?

14       A.   I don't know.  I was not involved in the

15   conversation with Mr. Britt and Mr. Randleman.

16       Q.   Did that -- was Mr. Randleman's relationship

17   with Ms. ███████ contrary to department policy?

18       A.   No.  Not if it was just, you know, seeing --

19   no.  But if it was stalking or something like that,

20   absolutely it would be contrary, contrary to policy.

21       Q.   So at some point, Ms. ███████ filed a

22   complaint; is that right?

23       A.   Yes, sir.  That's my understanding.

24       Q.   I'll show you what we're marking as

25   Exhibit 16.

1          (PLAINTIFF'S EXHIBIT NUMBER 16 WAS MARKED.)

2             (The witness reviews the document.)

3     A.   Yes, sir.

4     Q.   Have you seen the document before?

5     A.   Yes, sir, I have.

6     Q.   And what is this document?

7     A.   This is a document referencing details of

8  the complaint of Ms. ██████████████ filed on

9  Jeffrey Randleman.

10    Q.   Okay.  And I guess it's -- there's a date on

11 the first page there.  It says "Date complaint

12 received, October 29, 2013"?

13    A.   29.  Yes, sir.

14    Q.   And there's like a cover page and then

15 there's a letter from -- or a memo from Lieutenant

16 Denham to Captain Wilburn (sic) about the complaint?

17    A.   That's correct.

18    Q.   Was this complaint investigated?

19    A.   Yes, sir, it was.

20    Q.   How was that investigation done?

21    A.   Interviews, which is standard for an

22 internal investigation.

23    Q.   Who conducted the interviews?

24    A.   I think this one was Randy Denham that

25 submitted this.

1    think December 12, '13 --

2        A.    I believe you're right.

3        Q.    -- does that look right?  Okay.

4              And that's the same -- that's the same date

5    as this second letter from Dr. Kling?

6        A.    Right.

7        Q.    So this document shows that Mr. Randleman

8    was exonerated for the unbecoming conduct

9    allegation?

10       A.    That's what it shows, unbecoming conduct

11   exonerated.

12       Q.    And he was not --

13       A.    Go ahead.

14       Q.    He was -- besides the counseling, he was not

15   given any sort of disciplinary suspension or --

16       A.    No, sir.

17       Q.    No suspension without pay?

18       A.    Not to my knowledge.

19       Q.    He wasn't demoted?

20       A.    Not to my knowledge, no, sir.

21       Q.    There's no formal reprimand in his file?

22       A.    No, sir.

23       Q.    When was the trial in the DOJ lawsuit?

24       A.    August -- it was in August of this year.

25       Q.    This --

1         A.   Past year.

2         Q.   Past year?

3         A.   Yes, sir.

4         Q.   So 2015?

5         A.   That's correct.  Yes, sir.  That's right,

6    August.

7         Q.   And Officer Randleman testified at that

8    trial?

9         A.   Yes, sir, he did.

10        Q.   And he testified -- he was called by the

11   Department of Justice?

12        A.   Called by the Department of Justice, yes,

13   sir.

14        Q.   Did you know beforehand that he was going to

15   testify?

16        A.   I don't think I did.  My attorney may have.

17   I didn't see a list of witnesses.  I don't recall

18   seeing a list of witnesses.

19        Q.   So did you find out he was going to testify

20   when he was called to the stand?

21        A.   When he went to the stand, yes, sir.

22        Q.   And you were present during his testimony?

23        A.   The whole time.

24        Q.   Did you speak to Officer Randleman at all

25   during the trial?

1     A.   During the trial, I think there was a break

2    where we went out in the hall and I think I told

3    Officer Randleman, "You've got a real good memory,

4    sir."  And he did.

5     Q.   Did he say anything to you?

6     A.   Yeah.  I mean just like a friendly, yeah,

7    man, something like that.

8     Q.   And did you say anything else to him?

9     A.   No.  Because I had to go back in a room.

10   Officer Randleman, I don't know where he went.

11    Q.   Other than that conversation, did you talk

12   to Officer Randleman during the trial?

13    A.   No, sir, did not.

14    Q.   What did Officer Randleman testify about?

15    A.   He testified a meeting with -- a county

16   commissioner, Ann Vaughan came in raising cane with

17   me.  She had had a wreck in Burlington hit by a

18   person of Latino descent.  She said he was illegal

19   and she wanted -- and Burlington wouldn't charge him

20   and she wanted me to do something about it.

21          Myself and Ms. Vaughan never got along.  I

22   didn't want -- you know, I didn't want to deal with

23   her.  Randleman was coming down.  I said, "Jeff,

24   come here a minute.  Take care of this problem here.

25   She's got a problem, says the guy is illegal."  But

1    told it.  Everything he said was correct.  And I --

2    I testified on the stand to the fact.  I don't -- I

3    don't know what the problem was.

4        Q.   Did you review the legal briefs that were

5    filed by the parties after the trial?

6        A.   I'm sure I did.  I read so many legal

7    documents.

8        Q.   I'm sure they were very short, right?  They

9    were -- everything was very short?

10       A.   Oh, no.

11       Q.   But after the trial, both sides files briefs

12   to the court --

13       A.   Yes, sir.

14       Q.   -- reflecting their position based on the

15   testimony at the trial; is that right?

16       A.   Yes, sir, that's correct.

17       Q.   Did the Department of Justice rely on

18   Mr. Randleman's testimony as helpful to its case?

19       A.   I don't think so.  Like I say, I didn't see

20   it being helpful.

21       Q.   Okay.  So then I think I mis -- I misspoke

22   before.  So the trial occurred -- the trial occurred

23   in 2014; is that correct?  I think I might have said

24   2015.

25       A.   That's right because it took a year to write

1    the brief.

2        Q.   Okay.  Yeah.  I wanted to correct myself.

3    It was 2014, summer of 2014?

4        A.   Right.  That's correct, August.

5        Q.   Okay.  And then later in 2014, you were

6    re-elected?

7        A.   That's correct.

8        Q.   And you ran unopposed?

9        A.   Yes, sir.

10       Q.   And then you had decide to which officers to

11   reswear in?

12       A.   That's correct.

13       Q.   Okay.  And you did not reswear in

14   Mr. Randleman?

15       A.   I did not reswear in Mr. Randleman.

16       Q.   And he was the only officer that was not

17   resworn?

18       A.   That's correct.

19       Q.   Why did you not reswear in Mr. Randleman?

20       A.   Anger issues causing problems between our

21   agency, the highway patrol.  I mean I had to look at

22   a bunch of circumstances surrounding that and what

23   it would do -- what it did to our agency and image

24   of our agency.

25       Q.   So what circumstances did you look at in

1    Q.   Okay.  So you're saying you could have

2    terminated him --

3    A.   Absolutely.

4    Q.   -- after he was exonerated?

5    A.   Absolutely.

6    Q.   Were there any other reasons for not

7    swearing in Officer Randleman?

8    A.   Just, you know, the -- what I'm saying is

9    the anger management issues that apparently was

10   exhibited with DOJ.  And from that point on, things

11   started getting worse with him.  We started, you

12   know, receiving complaints.  Whether they were

13   justified or not, I don't know.  But certainly going

14   to the trooper's house at 4:30 in the morning, I

15   don't need that at the Alamance County Sheriff's

16   Office.  And I chose to exercise my authority as

17   sheriff of Alamance County not to swear him back in

18   or appoint him back in.

19   Q.   When did you make that decision?

20   A.   Probably right after this happened.  Right

21   after the situation with him and the -- and the

22   trooper.

23   Q.   Do you have any document showing that you

24   made the decision then?

25   A.   Right here.

```
 1        Q.   Sorry, you --
 2        A.   My head, yeah.  In my mind.  I knew what I
 3   was going -- you know, I knew what I was going to
 4   do.
 5        Q.   Do you have any written document showing --
 6        A.   No, sir.
 7             MR. HILL:  Sorry, I moved your papers.
 8             THE WITNESS:  Do what?
 9             MR. HILL:  Moved your papers back, so
10   I'm sorry.
11   BY MR. GHOSH:
12        Q.   Were there any written documents about your
13   decision at the time of, you know, 2014 at the
14   swearing in time?
15        A.   No, sir.
16        Q.   Okay.  Who did you tell about your decision
17   to not reswear in Mr. Randleman?
18        A.   I told my county attorney and assistant
19   county attorney, Ben Pierce, that I was not going to
20   swear him in.
21        Q.   Did you tell anyone in your department?
22        A.   Yes, sir.
23        Q.   Who did you tell?
24        A.   Chief Deputy Tim Britt and maybe Major
25   Shelton Brown.
```

1      Q.   Did you tell Mr. Randleman about your

2    decision?

3      A.   No, sir, I did not, not until the time that,

4    you know -- well, he knew he wasn't going to be

5    sworn in prior to the swearing in ceremony.

6      Q.   Who informed him of that?

7      A.   Chief Deputy Tim Britt.

8      Q.   Let me show you what I'm marking as

9    Exhibit 21.

10       (PLAINTIFF'S EXHIBIT NUMBER 21 WAS MARKED.)

11     Q.   Have you seen this document before?

12     A.   Yes, sir.

13     Q.   What is this document?

14     A.   This is a termination of employee.  It says

15    "Terminated Employee."

16     Q.   And this is for the termination of

17    Mr. Randleman?

18     A.   That's right.  Let me explain something to

19    you.  This is a county form.  If a person quits,

20    leaves under any circumstance, whatever, it's still

21    the same form they use.  And he was not terminated.

22    He was just not appointed.

23     Q.   Okay.  The reason here down at the bottom,

24    it says, "Terminated Date:  12/1/2014," and then it

25    says, "Reason:  Termination," do you see that?

1          A.   Yes, sir, I do.

2          Q.   Is there any other document that describes

3     the reason for his termination or his not being

4     resworn?

5          A.   No, sir.  I don't have to provide a

6     document.  That's a decision of the sheriff.

7          Q.   When Deputy Chief Britt filled out this

8     form, Exhibit 20 --

9          A.   Uh-huh.  Yes, sir.

10         Q.   -- would you have seen that?

11         A.   Not necessarily.

12         Q.   Do you recall this document?

13         A.   No, sir.  Not until I went through the

14    internal investigation file prior to coming here.

15         Q.   Prior to today?

16         A.   Right.

17         Q.   Are you supposed to be informed about the

18    results of investigations?

19         A.   Well, I knew the result.  As a result of the

20    investigation, they were recommending counseling to

21    Mr. Randleman.  And I was fine with that.

22         Q.   Are you supposed to be informed of the, you

23    know, the disposition of a complaint?

24         A.   Could be, yes, sir.

25         Q.   Could be?

1          A.    Yes, sir.

2          Q.    Are you --

3          A.    If there was action taken, I would have seen

4     that other than the -- the counseling.

5          Q.    Did you ever talk to Chief Deputy Britt --

6          A.    Yes, I did.

7          Q.    -- about the decision for it to say

8     exonerated?

9          A.    Only thing I talked to him about was to make

10    sure that Jeff was receiving the proper counseling

11    and try to help him where we could.

12         Q.    Did you ever talk to anyone at the highway

13    patrol about the incident with Mr. Randleman?

14         A.    Highway patrol, no, sir.

15         Q.    Do you know if the incident with

16    Mr. Randleman caused any problems with the highway

17    patrol?

18         A.    I don't know if it did, but it could have.

19    I know it, in my opinion, tarnished the image of the

20    Alamance County Sheriff's Office.

21         Q.    If Mr. Randleman engaged in conduct that was

22    unbecoming and tarnished the department in 2013, why

23    wasn't his complaint sustained?

24         A.    I have no idea.

25                MR. GHOSH:  We've been going for about

```
 1      another hour.  Can we take about a five-, ten-minute
 2      break?
 3                  MR. HILL:  Absolutely.  Sure.
 4                  (Recess taken from 2:41 to 2:48.)
 5                  THE WITNESS:  Can I go back?  And I
 6      think I misunderstood or I've been thinking I
 7      misunderstood.  You asked the question about
 8      anything else involving why I did not swear Jeff
 9      Randleman back in.  And I thought you were referring
10      to -- and I want to make sure you were referring to
11      the situation with the trooper or any situation?
12                  MR. GHOSH:  I was referring to any
13      situation --
14                  THE WITNESS:  Okay.
15                  MR. GHOSH:  -- any reason.
16                  THE WITNESS:  There was other
17      situations that disturbed me as sheriff and I'll
18      tell you.
19          There appeared to be the unplugging of the
20      auto vehicle locator in certain places in the
21      county, sometimes several hours between the locator
22      being turned off and coming back on.  That can be
23      done by only two ways; one is to cut your computer
24      off, or go to the trunk of your car and unplug the
25      auto vehicle locator.
```

1            And the second thing that bothered me was

2    our responsibility was in the County of Alamance,

3    not the City of Burlington.  And from the auto

4    vehicle locator, he was spending a tremendous amount

5    of his shift at certain locations, around certain

6    locations in Burlington.

7    BY MR. GHOSH:

8       Q.   What is the auto vehicle locator?

9       A.   It's a computer -- it's in the trunk of the

10   car.  It runs off a GPS.  And it's really a safety

11   issue should the officers -- if something happens,

12   you can bring it up on the computer and see where

13   the vehicle is, et cetera.  And it's runs off GPS.

14   It can tell me at any given time where an individual

15   is in the county as far as his patrol section or

16   whatever.

17      Q.   How were you informed about this concern

18   about the vehicle locator?

19      A.   Believe it or not, I check them a lot on the

20   computer myself just to make sure my people are

21   traveling to the farthest areas of the county on

22   patrol, coming back; not spending too much time at

23   their home or a restaurant.

24      Q.   Is sometimes the auto vehicle locator called

25   AVL?

1      A.   AVL, yes, sir.  Yes, sir.  Auto vehicle.

2      Q.   So you got concerned because of your own

3   observations of the AVL information?

4      A.   Yes, sir.  I check -- I check that.  And

5   also have my major checking constantly our patrol

6   vehicles.

7      Q.   So with Mr. Randleman, was that something

8   that you had seen or your major had seen?

9      A.   No.  I got -- there's printout sheets on

10   where that vehicle was during that period of time.

11      Q.   Okay.  And that was something you printed

12   out yourself?

13      A.   No.  I got Major Brown to print it out.

14      Q.   Okay.  So you asked Major Brown to print it

15   out?

16      A.   I did.

17      Q.   When did you do that?

18      A.   Oh, shucks.  It was prior to the swearing

19   in.

20      Q.   Soon prior or like months beforehand?

21      A.   No.  It was beforehand, before the swearing.

22   I don't know.  I can't tell you the number of weeks

23   or days.

24      Q.   I mean like a year before or like --

25      A.   Oh, no.  It was -- it was during --

```
 1       Q.   -- close before --

 2       A.   -- some of the problems started in 2013 and

 3   2014 with the lady and shortly thereafter.  And I

 4   would -- it's got the dates on the printouts.  I

 5   just don't have them here with me.  But it will give

 6   you the date.  But those times his vehicle, auto

 7   vehicle locator, the computer was shut off, which

 8   shuts the locator down or it was unplugged for

 9   hours.

10       Q.   Okay.  And that was a problem that you

11   noticed in the data yourself?

12       A.   Yes, sir.

13       Q.   Okay.

14       A.   And I...

15       Q.   Okay.  And then you talked to Major Brown

16   about that?

17       A.   I asked Major Brown, I said, "Do me a favor.

18   How about pulling up his auto vehicle locator.  I

19   want to see where he's spending his time.  How much

20   time his locator is undone or whatever is happening

21   to it, I want to know."  And he ran the copies for

22   me and showed me.

23       Q.   Did you -- besides Major Brown, did you talk

24   to anybody else about the issue?

25       A.   Sure.  I'm sure I talked to Chief Deputy
```

1    because I talk to Chief Deputy all the time.

2        Q.   Did you talk to Officer Randleman's

3    supervisor?

4        A.   I'm not sure, but I think Major Brown spoke

5    with his supervisor.  I'm not totally sure, but I

6    would hope he would.

7        Q.   Did you talk to Officer Randleman about the

8    issue?

9        A.   No, sir, I did not.

10       Q.   Did anyone else talk to Officer Brown about

11   the --

12       A.   I do not know.

13       Q.   Was there an investigation done about the

14   AVL issue?

15       A.   No, sir.  I made up my mind at that point in

16   time that I would not swear him back in, that I

17   would not reappoint him to another four-year term.

18       Q.   I'm going to show you what we're marking as

19   Exhibit 22.

20       (PLAINTIFF'S EXHIBIT NUMBER 22 WAS MARKED.)

21            THE WITNESS:  I've got the highlighted

22   areas on mine.  I can run to my office and get them.

23   I'll show you concerns.  What was the date on that?

24            If I -- like I say, I've got these over in

25   my office, but if I could -- I know y'all are in a

1    hurry, but if I could run -- the highlighted areas

2    on the ones that --

3    BY MR. GHOSH:

4        Q.   What is this document?

5        A.   This is the printout of the auto vehicle

6    locator, GPS, where they were, the time, how long

7    they stayed out at the place, how long -- you know,

8    if they unplugged it or turned it off.

9        Q.   Okay.

10       A.   You know, you can see I testified about

11   being in town all the time.  Tarleton Avenue, if

12   you'll look on page 33, all this is pretty much in

13   town.  Several times that was the case.  And our

14   patrol area is --

15            MR. HILL:  Slow down.  I think -- where

16   were you?

17       Q.   What page?

18       A.   All right.  Look at page 33.  And like I

19   said, I've got --

20       Q.   I think -- you mean 83?  Sorry.  It's a

21   little faded.

22       A.   Oh, 83.  I said 33.  But I've got some

23   different ones in this too, I think, that I had

24   highlighted.  Sometimes there were four hours before

25   the locator would come back up.

1    Q.   So this is something you had printed up in
2    2014?
3    A.   Yes, sir, prior to releasing him.
4    Q.   Prior to releasing him?
5    A.   Right.  And it was placed into the personnel
6    file.
7    Q.   Placed in the personnel file.  And was the
8    copy that was placed in the personnel -- was the
9    copy that was placed in the personnel file, was that
10   copy highlighted?
11   A.   I don't know if that -- I highlighted when I
12   got a copy of it.  I didn't -- I didn't take the one
13   from the personnel file.  I highlighted what --
14   where my questions were.
15   Q.   Okay.  Did you do highlighting in 2014?
16   A.   That was prior to swearing him in, I
17   believe.
18   Q.   Not reswearing him?
19   A.   Not reswearing him.
20        MR. GHOSH:  So I think -- I don't think
21   we should do it today, but I'd like to just have
22   that document produced and we can --
23        THE WITNESS:  Do you want me to go get
24   it?
25        MR. HILL:  No.  I will get it from you

1    and provide it --

2                THE WITNESS:  Okay.

3                MR. HILL:  -- to opposing counsel.

4    BY MR. GHOSH:

5       Q.   Okay.  Is this the whole document that you

6    referred to or reviewed?

7       A.   I don't have the documents.  I got -- I mean

8    I didn't do his for 50 months or something like

9    that.  I did it, you know, for a period of time that

10   I had some questions about it.

11      Q.   With this AVL issue, did you follow the

12   investigation policy that's set forth in the

13   Internal Affairs policy?

14      A.   No, sir.  At that point in time, I made up

15   my mind I was not going to reappoint Deputy

16   Randleman to the Alamance County Sheriff's Office.

17      Q.   Before you decide to terminate an officer

18   for a reason, is it important to validate that

19   reason?

20      A.   With the past history with the trooper, the

21   anger management thing, no, sir.  I didn't feel it

22   necessary.  Looking at the AVL, the officer is

23   spending the majority of his time in the city and we

24   don't cover the city and -- as far as patrol.

25                And two and three, sometimes four and six

1    hours that the AVL was down or unplugged -- and when

2    I say down cut the computer off or unplug the AVL --

3    I didn't see a need to do an investigation.  I made

4    up my mind.  I was going to exercise my authority as

5    sheriff to not reappoint him to another term.

6        Q.   Just a few minutes ago we had taken a short

7    break.  Did you speak to your attorneys during that

8    break?

9        A.   Sure did.  Sure did.  Uh-huh.

10       Q.   Did you speak to them about the AVL issue?

11       A.   Yes, sir.  And I -- I was supposed to bring

12   it back up in here because I thought you were

13   talking about any issues involving the trooper, any

14   further issues involving the trooper, his

15   termination.  I had planned to talk about the AVL.

16   Got it right here.

17       Q.   I'm going to show you what we're going to

18   mark as Exhibit 23.

19       A.   Okay.

20       (PLAINTIFF'S EXHIBIT NUMBER 23 WAS MARKED.)

21       Q.   Have you seen this document before?

22       A.   Yes, sir.

23       Q.   What is this document?

24       A.   This is a form that has to go to the North

25   Carolina Sheriff's Training and Standards.  And

1    those documents goes when you hire someone; document

2    goes when they leave your agency.

3        Q.   Is this called the Form F-5?

4        A.   Yes, sir.

5        Q.   And is this a standard form that all North

6    Carolina law enforcement agencies use?

7        A.   Sheriff's Standards Division does.  Now

8    municipal has their own division and that would be a

9    different form, I'm sure, that they have to fill

10   out.

11       Q.   Okay.  And may also be called an F-5?

12       A.   Yes, sir.

13       Q.   But this is something that all the sheriffs

14   use whenever an officer is separated from a

15   department?

16       A.   That's correct.  Uh-huh.

17       Q.   And the form is sent to the -- to the

18   Division of Standards?

19       A.   That's correct.

20       Q.   And then they have it on file and then other

21   law enforcement agencies can request information

22   from this?

23       A.   Yes, sir.  If the officer signs a form for

24   the release.

25       Q.   Okay.  So this -- okay.

1            If you look on this form sort of toward

2    the -- it's got basic information and it's got a

3    date of separation of 12/1/14.  Do you see that?

4        A.   Yes, sir, I do.

5        Q.   Then there is a question:

6            "Was this separation a result of a criminal

7    or a violation of commission rules?"  And it's

8    checked "No"?

9        A.   That's correct.

10       Q.   And then it says:

11           "Are you aware of any ongoing or

12    substantiated internal investigation regarding this

13    officer within the last 18 months?"

14           And that's checked "No"; is that correct?

15       A.   That's correct.

16       Q.   Why were both of those boxes checked no?

17       A.   Because I chose not to reappoint.  This was

18    not a hiring or in the middle of anything.  I chose

19    to not reappoint Mr. Randleman because he did not

20    meet the standards of what I felt like an Alamance

21    County deputy sheriff should be based on previous

22    situations.

23       Q.   Okay.  And this -- in the second check box,

24    by saying "no," there was no ongoing internal

25    investigation, correct?

1          A.   No, sir.

2          Q.   And there was not?

3          A.   There was not.

4          Q.   And it also means that there was no

5     substantiated investigation in the last 18 months,

6     and that's -- that's what that means, right?

7          A.   That's what it means.

8          Q.   And that was correct?

9          A.   That's correct.

10          Q.   Because the ███████████████ complaint

11     happened within the 18 months before this, correct?

12          A.   I think so.

13          Q.   And that was not substantiated?

14          A.   It was substantiated.  He went to the

15     trooper's house raising cane at 4:30 in the morning.

16     That was substantiated.  You know, as a result, he

17     agreed to go to counseling because he knew he had an

18     anger management problem.  And he went to counseling

19     successfully and completed counseling according to

20     the doctor's letter.

21          Q.   Well, if that investigation was

22     substantiated, why is that -- and that was within

23     the last 18 months, why isn't that marked yes?

24          A.   First of all, it was not a criminal

25     investigation, per se, on Officer Randleman.  It was

1    conduct unbecoming.  Secondly, we did not -- and I

2    say we, I did not send this form in, Hackney did.

3    Did not want to hurt Mr. Randleman's chances down

4    the road if he wanted to go back in law enforcement.

5        Q.   So are you saying that the -- and I know

6    that -- I'm not really talking about -- the first

7    check box asks about criminal investigation.

8        A.   Right.

9        Q.   And then -- and then the second check box

10   just talks about any internal investigation, but --

11       A.   It says --

12       Q.   -- it doesn't refer to criminal, right?

13       A.   -- "Are you aware of any ongoing."  That

14   investigation was over.

15       Q.   Well, it's "Ongoing or substantiated" --

16       A.   Okay.

17       Q.   -- "investigation within the last 18

18   months."  Do you see that?

19       A.   And on the form it showed as exonerated in

20   the thing.  Not that he didn't do it, but I think

21   because of his agreement to go to counseling, which

22   was offered by our agency in the county, it was

23   exonerated.

24       Q.   He was exonerated and so the complaint was

25   not substantiated; is that correct?